RENDERED:  APRIL 8, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1234-ME

MATTHEW RINGER                                                       APPELLANT

APPEAL FROM ANDERSON FAMILY COURT
v.           HONORABLE S. MARIE HELLARD, JUDGE
ACTION NO. 21-D-00064-001

ALLISON ZELLER                                                        APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, LAMBERT, AND K. THOMPSON, JUDGES.

LAMBERT, JUDGE:  Matthew Ringer has appealed from the domestic violence order (DVO) entered by the Anderson Family Court entered October 5, 2021, pursuant to a petition filed by Allison Zeller.  We affirm.

This matter began with the filing of a petition for an order of protection by Allison against Matthew on September 27, 2021.  While they never married, Allison and Matthew had lived together.  In the petition, Allison alleged

that on September 7, 2021, Matthew had engaged in an act or acts of domestic

violence and abuse based on the following circumstances:

> Matthew and I would have been together for 4 years in March. We've known each other for about 5 years and we were engaged for 2 years. Matthew went to prison for about 2 years. From February 2019 to December 2020. He proposed in July of 2019. Matthew has always had a way with words and has always manipulated me into doing what he wanted because I thought it was love. When Matthew and I argued we never laid hands on each other. We said hurtful things and sometimes got [too] close while screaming at one another but it didn't get physical until about 4 months after he got out of prison, then when we argued he would scream so hard that he would spit in my face and poke his finger into my forehead to get me out of his way. The way he and I dealt with things was too different for us to understand. When something happens, I always wanted to talk about it right away and he wanted to be left alone to think about stuff. At times I tried to leave him be but I did try to get him to talk to me in those times.

> On September 7th, 2021, we woke up that morning and nothing seemed wrong. I had a job interview and he went to help a friend with something and when I called I was trying to play a prank by saying that I was mad because I didn't get the job but he hung up on me and wouldn't answer. He texted me and we talked back and forth (I can provide messages). He said he was going to come get his stuff. I was at home when he got there and I asked why he was leaving and he said it was because of me. I followed him into the bedroom and asked what I did to make him leave and he said "I don't love you anymore[.]" [O]ut of hurt and anger I started screaming "get the [f***] out of my house[.]" [H]e then turned around and said "what did you just say to me?" and I repeated myself. He then left where he was stand[ing] (at the back of the bedroom in the closet) and ran at me and I

put my arms in front of my face to protect myself and he grabbed both arms and pushed me from my bedroom door to my back door, squeezing my arms, spitting in my face and saying "is that what you [f\*\*\*\*\*\*] wanted?". I started screaming "let me go" and I did try to spit in his face to get him off of me but he is a big man and I was afraid if I fought back he might end my life. (I can provide pictures.) [A]fter that happened, I started recording a video of his behavior and he admitted to putting his hands on me. I stayed on the opposite side of the room from him but I was scared of what he would [do] if I tried to call someone or if I left him alone in my house. Since September 7th, Matthew has done nothing but harass me and threaten me. He has made fake social media accounts to harass me, he has texted me off of multiple phone numbers, he is messaging all of my family and friends saying that he's going to kill himself, and he hacked my phone and changed the password to my AT&T account. He is sharing my private information, tracking my location and listening in on my phone calls. I know this because a friend came to me and said "I am worried for your safety because Matthew showed up drunk to my house and was laughing and showing me how he can see your texts, calls, locations . . . [.]"

In addition to these things, he has contacted my mom, my step [d]ad, my cousins who live in North Carolina and a few of my friends trying to harass them or to try to find me/talk to me. I [d]o have screen shot[s] of everything. I have messages, pictures of my bruises and videos. The actions I have taken on my own were not enough. I cut off his phone (it is in my name) and I cut all ties including: car insurance, debit/credit cards, bank accounts, I've deleted all of his personal info from my phone. I was his power of [attorney] for the 2 years he was in prison. Also I work at a daycare and my boss knows my situation, she called me to her office and asked to see a picture of Matthew because she said a strange man showed up asking questions but she wasn't 100%

sure it was him.  She said it did look just like him though. The only time I have reached out to him since he left was the night he said he was going to kill himself, I called twice but he didn't answer and then on September 24 & 25 I received weird texts from a number and tried to call but no answer.

I have pictures that he sent me of his "suicide plan."  That night & the next morning my mom and I called the Frankfort police department for a wellness check.  I've contacted AT&T 3 times to get my account reset and it keeps getting change[d].  There is information about me coming from him that I have never texted about or talked on the phone about but he still knows.  I'm pretty sure he's using my phone's microphone to listen in on me.  He's been contacting my friends to meet with him to relay information to me because I won't talk to him.  I've blocked him on everything.  All of this is happening daily for the last 3 weeks.

In the petition, Allison requested that the court restrain Matthew from committing any further acts of domestic violence, from any unauthorized contact or communication with her, from going within a specified distance of her residence and work, and from disposing of or damaging their property.  The family court did not enter an emergency protection order (EPO) as the petition failed to "state an immediate and present danger of dating violence and abuse [or] stalking[.]" Instead, the court signed a protective order summons on September 27, 2021, which was served on Matthew by the Anderson County Sheriff's Department on October 1, 2021.

-4-

The court held a hearing on October 5, 2021, during which the parties appeared via ZOOM without counsel. Allison confirmed that she and Matthew had previously lived together. Allison testified about the acts of violence that took place on September 7th as detailed in her petition. He ran across the room, grabbed her arms as she put them up to shield her face, and threw her up against the door to the bedroom. She tried to do what she could to get away, but said "he's pretty strong." This action surprised and scared her as she did not expect it. This was the only altercation between them, although Matthew had also screamed in her face and poked her in her forehead a few times since he had returned from prison. She did not think much of this at the time, although she did not like it. She said she was in fear for her safety, stating that her messages and phone calls had been listened to and her location followed through AT&T, specifically linked to the phone number Matthew had. She also said she was scared because she filed the petition on Monday, and on Friday, Matthew broke into her house and took property. She thought the summons could have been issued sooner or an escort could have taken him to her house instead of breaking in while she was at work. She was afraid for her life, and as an example stated that a family member had told Matthew to leave Allison's property, and in response Matthew stated it was his property.

Matthew also testified. He related an argument on September 7th with Allison over the phone where she yelled at him about spending time with friends, which resulted in his saying he was done with the relationship. He mentioned that he had emotional issues and anxiety, for which he needed space and the ability to pull back when Allison wanted to argue. He had been telling Allison for months that he was stressed out and under anxiety, and that he needed space.

Matthew told Allison he was coming home to get his stuff and leave on the day in question. He said he had text messages that Allison would not be able to watch him pack his belongings. But she was in the house when he arrived and asked him why he was so mad. She kept wanting to talk about it, while he kept saying he just wanted to pack up his belongings and leave. Allison continued to scream at him and told him to leave the house. Matthew stated that he got mad at something Allison said, went over to her, and poked her in her head. Allison threw her arms up, he grabbed her wrists not knowing if she was going to hit him, she scarily said to let go of her, and he realized he had gotten too angry. This is the reason he decided to leave. He let her wrists go and swung them down. He called his mother so that she could listen over the phone. He began venting to his mother, and Allison screamed at him again. He hung up the phone and called the sheriff's department. He began recording his conversation with Allison, during which he

-6-

stated Allison was begging him to stay. He told her he did not love her anymore. At that point, she stopped. He finished packing and left.

Matthew only returned to the house to get the rest of his property. He denied that an EPO had been entered at that time. He said he had a full video recording of going to the house with his boss. For three days after the incident, he did not contact her. However, he said she had been contacting his family members. He contacted her to demand that she stop doing this. At the end of his testimony, he said he had proof of the incident.

At the conclusion of the hearing, the family court stated that it was entering a three-year DVO with various terms attached. In the docket order, the court included written findings to support its finding that an act of domestic violence and abuse had occurred and may occur again:

> Grabbed by arms + "threw" her against door; only time this has ever happened. He broke into her house after she did the EPO. He has screamed in her face & poked her in the forehead. Is afraid of him.
>
> Admitted to poking her in the forehead & grabbing her wrists, and slung them down.

In addition to restraining Matthew from contacting Allison or being within 500 feet of her, the court ordered Matthew to complete a domestic violence assessment and comply with all recommendations, and that he was not to own, possess, or have access to any weapons.

Following the entry of the DVO, counsel made an entry of appearance on behalf of Matthew for purposes of filing a notice of appeal, and this appeal now follows.

On appeal, Matthew argues that the family court erred in entering the DVO for two reasons.  First, the family court did not provide him with the opportunity to present his proof before entering the DVO.  And second, there was insufficient evidence that would permit the court to determine that domestic violence and abuse had occurred and may occur again.

In *Clark v. Parrett*, 559 S.W.3d 872, 875 (Ky. App. 2018), this Court set forth the statutory definition of domestic violence and abuse and the appropriate standards of proof and review:

> "Domestic violence and abuse" is defined as "physical injury, serious physical injury, stalking, sexual abuse, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, or assault between family members or members of an unmarried couple[.]"  Kentucky Revised Statutes (KRS) 403.720(1).[1]  "Any family member or any member of an unmarried couple may file for and receive protection . . . from domestic violence and abuse[.]"  KRS 403.750(1).  "Following a hearing . . . if a court finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur, the court may issue a domestic violence order[.]"  KRS

---

[1] In the current version of the statute, effective April 1, 2021, "domestic violence and abuse" is defined as "physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple[.]"

403.740(1). "Our review in this Court is not whether we would have decided the case differently, but rather whether the trial court's findings were clearly erroneous or an abuse of discretion." *Gibson v. Campbell-Marletta*, 503 S.W.3d 186, 190 (Ky. App. 2016).

And in *Williford v. Williford*, 583 S.W.3d 424, 427-28 (Ky. App. 2019) (footnote omitted), this Court further explained the standard of proof and review:

> The preponderance of the evidence standard is met when sufficient evidence establishes that the petitioner is "more likely than not" to have been a victim of dating violence and abuse, sexual assault, or stalking. *See Baird v. Baird*, 234 S.W.3d 385, 387 (Ky. App. 2007) (applying the preponderance of the evidence standard in the context of the issuance of a domestic violence order).
>
> Additionally, CR 52.01 provides that a trial court's "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *See also Reichle v. Reichle*, 719 S.W.2d 442, 444 (Ky. 1986). Findings are not clearly erroneous if they are supported by substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). Substantial evidence is evidence of sufficient probative value that it permits a reasonable mind to accept as adequate the factual determinations of the trial court. *Id.* A reviewing court must give due regard to the trial court's judgment as to the credibility of the witnesses. *Id.*

"[T]he family court is in the best position to judge the credibility of the witnesses and weigh the evidence presented." *Williford*, 583 S.W.3d at 429 (citing *Hohman v. Dery*, 371 S.W.3d 780, 783 (Ky. App. 2012)). We are mindful that "[t]he domestic violence and abuse statutes are to be interpreted by the courts to allow

victims to obtain protection against further violence and abuse." *Kingrey v. Whitlow*, 150 S.W.3d 67, 70 (Ky. App. 2004).

Matthew's first argument addresses whether the family court erred in failing to provide him an opportunity to submit his "proof." In *Williford, supra*, this Court addressed the requirement that a court must conduct a full hearing before making a decision on a DVO petition:

> "[A] DVO has significant long-term consequences for both parties[.]" *Rankin v. Criswell*, 277 S.W.3d 621, 625 (Ky. App. 2008). "[T]he impact of having an EPO or DVO entered improperly, hastily, or without a valid basis can have a devastating effect on the alleged perpetrator." *Wright v. Wright*, 181 S.W.3d 49, 52 (Ky. App. 2005).

> A DVO "cannot be granted solely on the basis of the contents of the petition." *Rankin*, 277 S.W.3d at 625. Due process is not satisfied when a DVO is granted without a full hearing, such as when testimony is not presented, or is cut short. *Wright*, 181 S.W.3d at 53. "[A] party has a meaningful opportunity to be heard where the trial court allows each party to present evidence and give sworn testimony before making a decision." *Holt v. Holt*, 458 S.W.3d 806, 813 (Ky. App. 2015). Without a full hearing, a trial court cannot make a finding based upon a preponderance of the evidence. *Wright*, 181 S.W.3d at 53.

*Williford*, 583 S.W.3d at 428.

Here, the family court certainly permitted Matthew to testify as to his version of the events that took place on September 7, 2021. During this sworn testimony, Matthew admitted that he had poked Allison in the forehead, grabbed

-10-

her wrists, and slung them down, as the family court found in its docket order. The court also permitted Matthew to testify about the context of the disagreement between him and Allison, and Matthew offered an explanation as to why he "slung" her arms down (he thought she might hit him). Based upon his own admissions, we can perceive no way that any additional proof Matthew might have wanted to show the court would in any way alter the decision the family court made to grant the DVO. Therefore, we reject this argument.

As to the second argument, Matthew disputes that Allison had established that an act of domestic violence and abuse occurred, including that she was in fear of the imminent infliction of domestic violence and abuse, or that a future act of domestic violence and abuse may occur.

In order to grant a DVO, a court must find "by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur[.]" KRS 403.740(1). "Domestic violence and abuse" is defined as: "physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple[.]" KRS 403.720(1). While KRS 403.720 does not contain a definition of physical injury, KRS 500.080(13) of the Kentucky Penal Code defines "physical injury" as "substantial physical pain or any impairment of physical condition[.]"

Matthew asserts that the only portion of the definition of "domestic violence and abuse" that the court could have used to support the entry of the DVO addressed the infliction of fear of imminent physical injury, etc. At the outset, we disagree with this assertion because Allison certainly could have experienced a physical injury when Matthew grabbed her wrists and pushed her arms down, or from Matthew poking his finger into her forehead. In addition, Allison testified that Matthew pushed her against a door, and in her petition she offered to provide photographs of her bruises, although these were not introduced during the hearing.

Matthew raises a constitutionality question regarding the portion of the definition of "domestic violence and abuse" that includes the infliction of fear. He argues that fear is a subjective emotion and, therefore, the definition is too vague and overbroad to pass constitutional muster as applied to him. Accordingly, he claims that his due process rights were violated.

Before a party may seek review of the constitutionality of a statute, certain requirements must be met. KRS 418.075 provides in relevant part that:

> (1) In any proceeding which involves the validity of a statute, the Attorney General of the state shall, before judgment is entered, be served with a copy of the petition, and shall be entitled to be heard, and if the ordinance or franchise is alleged to be unconstitutional, the Attorney General of the state shall also be served with a copy of the petition and be entitled to be heard.
>
> (2) In any appeal to the Kentucky Court of Appeals or Supreme Court or the federal appellate courts in any

forum which involves the constitutional validity of a statute, the Attorney General shall, before the filing of the appellant's brief, be served with a copy of the pleading, paper, or other documents which initiate the appeal in the appellate forum. This notice shall specify the challenged statute and the nature of the alleged constitutional defect.

In addition, Kentucky Rules of Civil Procedure (CR) 24.03 provides, "When the constitutionality of an act of the General Assembly affecting the public interest is drawn into question in any action, the movant shall serve a copy of the pleading, motion or other paper first raising the challenge upon the Attorney General."

> "[S]trict compliance with the notification provisions of KRS 418.075 is mandatory[.]" *Benet v. Commonwealth*, 253 S.W.3d 528, 532 (Ky. 2008). "Among the purposes underlying this statute is the right of the people, by the chief law officer, to be heard on matters affecting the validity of duly enacted statutes." *Maney v. Mary Chiles Hosp.*, 785 S.W.2d 480, 481 (Ky. 1990) (citing KRS 15.020). "Likewise, the prevention of collusive, non-adversarial proceedings between or among litigants which might result in the invalidation of state law is a matter of public interest." *Id.*
>
> . . . .
>
> "[T]he intent of the Legislature in its enactment of KRS 418.075 is clear that no judgment shall be entered which decides the constitutionality of a statute until the Attorney General is given notice and an opportunity to be heard." *Maney*, 785 S.W.2d at 482.

*Delahanty v. Commonwealth*, 558 S.W.3d 489, 507-08 (Ky. App. 2018).

> In the present case, the body of the notice of appeal states, in full:

> Comes now Matthew Ringer, through counsel and gives notice that he appeals the final order of domestic violence in the above styled case on October 5, 2021.
>
> On appeal the Appellant will be Matthew Ringer and the Appellee will be Allison Zeller.

The Attorney General of Kentucky was served with a copy of the notice of appeal as well as with the brief Matthew filed in this appeal. However, Matthew failed to raise this constitutional question prior to the entry of the DVO below as mandated by KRS 418.075(1). Based on his status as a *pro se* respondent below, we will not hold him accountable for this failure. But Matthew then retained counsel, who filed his notice of appeal. While the Attorney General was served with the notice of appeal, the notice did not "specify the challenged statute and the nature of the alleged constitutional defect" pursuant to KRS 418.075(2). The basis of the constitutional challenge was not known until Matthew filed his brief. Therefore, we must hold that Matthew failed to properly preserve the constitutionality issue for our review, and we shall address it no further.

Finally, Matthew argues that Allison failed to present sufficient evidence to establish that an act of domestic violence would happen again. We disagree. In her petition, Allison detailed Matthew's behavior over the three weeks after the September 7th incident at her home, which included allegations of harassment via social media, listening and tracking her through her phone, and contacting her family, friends, and possibly her employer. During the hearing,

-14-

Allison testified that this behavior scared her. In addition, she claimed that Matthew had broken into her house and taken property a few days after she filed her DVO petition, which also scared her. This is sufficient to establish by a preponderance of the evidence that domestic violence and abuse may again occur.

Accordingly, we find no error or abuse of discretion in the family court's entry of the DVO.

For the foregoing reasons, the domestic violence order entered by the Anderson Family Court is affirmed.

ALL CONCUR.

BRIEF FOR APPELLANT:                    NO BRIEF FOR APPELLEE.

John Gerhart Landon
Lexington, Kentucky