RENDERED: APRIL 15, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1300-ME

RICHMOND ASHLEY POWERS        APPELLANT

v.        APPEAL FROM SHELBY FAMILY COURT
HONORABLE S. MARIE HELLARD, JUDGE
ACTION NO. 21-D-00135-001

ANGELA ALLEN OSBORNE        APPELLEE

OPINION
REVERSING

** ** ** ** **

BEFORE: CETRULO, DIXON, AND LAMBERT, JUDGES.

LAMBERT, JUDGE: Richmond Ashley Powers has appealed from the three-year domestic violence order (DVO) entered by the Shelby Family Court on October 21, 2021. Because we agree with Powers that there was insufficient evidence to support the entry of the DVO, we reverse.

Angela Allen Osborne filed a petition/motion on October 9, 2021, seeking an order of protection against her former boyfriend, with whom she had

lived in the past.  She indicated that a weapon was involved and that she believed

him to be armed and dangerous.  Angela set forth the basis of her petition as

follows:

> On September 30, 2021, Richmond Ashley Powers emailed me (to multiple email accounts) a suicide note. The context of the note was insulting and derogatory. This was not the first time that he had sent a note of [this] nature.
>
> Richmond was missing over 48 hours.  I was notified of his whereabouts by a therapist that Richmond was assigned to in Baptist Health-Corbin.  Richmond over the course of 2 days had attempted suicide twice, once with pills and a second time by carbon monoxide poisoning.  Richmond had driven onto the property of a homeowner in Berea, Ky.  It was on someone's private property.  Richmond was pulled from the car and taken to the local medical facility in Berea.  When hospital personnel were alerted that this had been a suicide attempt, he was sent to Baptist Health-Corbin.  The facility has a psychiatric unit.  During the course of the 7-day stay, I was called 3 different times by the therapist assigned to Richmond, asking if our relationship was over – I said that yes it was, all 3 times – I was told that "he was not going to take this well."
>
> His mother had relayed the message that Richmond was to be released from the Corbin facility and being transferred to a Lexington facility to be held for 2-3 more weeks.  Surprisingly, he was released today 10/8/21.
>
> When I was apprised that he was missing, his sister, Leigh Anne Burkhard, shared with me that he had a handgun and that his family has dealt with decades of his mental illness.  This was never shared with me.  As he had a handgun and I was the subject of his suicide

note, I was too scared to stay in my own home in Shelby County and had to go stay with my mother in New Albany, IN until he was found.

The last time I spoke to his therapist, she was not aware of the handgun as his family had not shared the information with her either. To my knowledge the handgun has not been located.

I fear for my life. He has no value of his own life due to the multiple suicide attempts and since I was the crux that started this spiral of events, I believe he has no value of my life. I don't want to have to be a victim before attention is called to him for his behavior. I ask that an Emergency Protective Order be granted to protect me.

The court entered an Emergency Protective Order (EPO) the same day, scheduled a hearing, and issued a protective order summons.

The court held a DVO hearing on October 20, 2021, where both parties appeared with their respective counsel. Angela described Richmond as her former boyfriend and stated that they had lived together. During her testimony, Angela introduced a copy of Richmond's suicide note, where he identified her multiple times as the primary source of his decision to commit suicide. She was fearful that he would hurt her as well. On cross-examination, Angela stated that her petition was solely based on the suicide note as well as later discussions she had with Richmond's therapist and sister, not on any act of domestic violence that occurred prior to the receipt of the email on September 30, 2021. Richmond did not attempt to contact her after that date, and she had not been aware that he had a

handgun. She admitted that Richmond had not stalked her, subjected her to any sexual abuse, attempted to strangle her, or threatened to do any of those things. Richmond was not found in her home after the suicide attempt. On redirect examination, Angela stated that the therapist made her fearful when the therapist told her that Richmond was not going to take the breakup well. On re-cross examination, Angela stated that her fear was not based on anything that happened prior to September 30, 2021.

At the conclusion of the testimony, Richmond moved to dismiss the petition based upon Angela's testimony. Her claim that the note was "insulting and derogatory" did not meet the definition of domestic violence and abuse. Her fear of imminent violence was not reasonable as it was based on a conversation made out of court by individuals who were not present to testify in court that day. And there was no history of abuse between them. In response, Angela argued that she had presented a case of imminent fear based on Richmond's multiple suicide attempts as well as his mental health history and access to a handgun, which she had not known about. In addition, his therapist told her Richmond was not going to take the breakup well. He had no value for his life and therefore had no value for her life. The court responded that it was not going to consider all of the out-of-court statements and the statements by third parties as that constituted hearsay. However, the court determined that sufficient evidence had been presented of the

suicide note that was frightening in nature and blamed Angela for causing the suicide, which the court believed could make a person fear for their safety. Therefore, the court denied the motion to dismiss.

Richmond testified next. He described that time in his life as very emotional. After he was found, he was taken to a hospital in Berea before being transferred to a facility in Corbin. He had not been in possession of a handgun at that time, nor did he own one. He was in in-patient mental health treatment for ten days, and he was continuing with such treatment. He admitted that he had owned antique firearms, but that these were keepsakes and were not able to be shot. He had turned these over to the police department. He never threatened Angela with those firearms or in any other manner. His intent when he wrote the note was that he wanted to end his life that day. He did not intend for Angela to be harmed; he was focused only on his life. He did not contact Angela after he sent the note or before she filed her petition. He was moving into an apartment in Nicholasville and had no desire to continue a relationship with her.

At the close of the testimony, Richmond argued that Angela's allegations and the evidence did not meet the definition of domestic abuse and violence. There was no history of domestic violence between them. Rather, he argued that the entire case appeared to be based on the fear of physical injury based on the suicide note, which did not mention a firearm. He did not own a handgun,

and his antique longarm guns had been surrendered. There was no evidence introduced to establish that Richmond was a danger to anyone other than maybe himself, although he was actively seeking treatment. There had not been any threats made to Angela or any basis for a fear of imminent physical injury, except through conversations between Angela and Richmond's therapist, and between Angela and Richmond's sister. Neither person testified at the hearing. Angela, in turn, pointed to the suicide note, in which Richmond named her as the primary cause, which she said was scary. Therefore, Angela believed she had good cause to be fearful for her own life.

The court entered an oral ruling finding that Angela had established that an act of domestic violence and abuse had occurred and may occur again. The court based this on Richmond's two suicide attempts in the recent past and the emailed suicide note blaming Angela for the suicide. The court found that this put Angela in imminent fear of injury or death that was reasonable based on the testimony presented that day. The court entered a three-year DVO. The court entered its written findings on the docket order, stating:

> Resp attempted suicide twice in recent past. Resp sent
> email to Petitioner which was a "suicide note." (See:
> Exhibit 1). In that note, Resp made comments like "that
> leaves you as the primary source," in answer to a
> question he poses of "[w]hat drove him face down?" He
> also says things in note like, "you set this in motion, the
> final nudge." Petitioner is fearful of these statements and

-6-

suicide attempts and is in imminent fear of injury, and/or death.

The DVO was entered on October 21, 2021, and was to be effective until October 10, 2024. This appeal now follows.

On appeal, Richmond continues to argue that the family court erred in finding that he had committed acts of domestic violence that support the entry of the DVO and that Angela's fear was based on statements of third parties, not prior acts of domestic violence. Angela did not file a responsive brief.

In *Clark v. Parrett*, 559 S.W.3d 872, 875 (Ky. App. 2018), this Court set forth the statutory definition of domestic violence and abuse as well as the appropriate standards of proof and review:

> "Domestic violence and abuse" is defined as "physical injury, serious physical injury, stalking, sexual abuse, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, or assault between family members or members of an unmarried couple[.]" Kentucky Revised Statutes (KRS) 403.720(1).[1] "Any family member or any member of an unmarried couple may file for and receive protection . . . from domestic violence and abuse[.]" KRS 403.750(1). "Following a hearing . . . if a court finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur, the court may issue a domestic violence order[.]" KRS 403.740(1). "Our review in this Court is not whether we

---

[1] In the current version of the statute, effective April 1, 2021, "domestic violence and abuse" is defined as "physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple[.]"

would have decided the case differently, but rather whether the trial court's findings were clearly erroneous or an abuse of discretion." *Gibson v. Campbell-Marletta*, 503 S.W.3d 186, 190 (Ky. App. 2016).

And in *Williford v. Williford*, 583 S.W.3d 424, 427-28 (Ky. App. 2019), this Court further explained the standard of proof and review:

> The preponderance of the evidence standard is met when sufficient evidence establishes that the petitioner is "more likely than not" to have been a victim of dating violence and abuse, sexual assault, or stalking. *See Baird v. Baird*, 234 S.W.3d 385, 387 (Ky. App. 2007) (applying the preponderance of the evidence standard in the context of the issuance of a domestic violence order).

> Additionally, CR 2 52.01 provides that a trial court's "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *See also Reichle v. Reichle*, 719 S.W.2d 442, 444 (Ky. 1986). Findings are not clearly erroneous if they are supported by substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). Substantial evidence is evidence of sufficient probative value that it permits a reasonable mind to accept as adequate the factual determinations of the trial court. *Id.* A reviewing court must give due regard to the trial court's judgment as to the credibility of the witnesses. *Id.*

In addition, the *Williford* Court recognized that "the family court is in the best position to judge the credibility of the witnesses and weigh the evidence presented." *Id.* at 429 (citing *Hohman v. Dery*, 371 S.W.3d 780, 783 (Ky. App. 2012)). We are mindful that "[t]he domestic violence and abuse statutes are to be

-8-

interpreted by the courts to allow victims to obtain protection against further violence and abuse." *Kingrey v. Whitlow*, 150 S.W.3d 67, 70 (Ky. App. 2004).

"Domestic violence and abuse" is currently defined in KRS 403.720(1) as "physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple[.]" We agree with Richmond that the family court based the entry of the DVO on the "fear" portion of the definition. "For purposes of KRS 403.720, the term "'[i]mminent" means impending danger, and, in the context of domestic violence and abuse[,] belief that danger is imminent can be inferred from a past pattern of repeated serious abuse.' KRS 503.010(3)." *Fraley v. Rice-Fraley*, 313 S.W.3d 635, 640 (Ky. App. 2010).

Richmond asserts that Angela's allegations do not rise to the level of domestic violence as it is statutorily defined and that, based on her own testimony, there is no evidence of a history or pattern of past abuse in their relationship that would establish a reasonable basis for her claimed fear of imminent harm. The suicide note, by itself, Richmond argues, is not enough to support a finding that he had committed an act of domestic violence. We agree.

Richmond cites to several cases in support of his argument. In *Ashley v. Ashley*, 520 S.W.3d 400 (Ky. App. 2017), this Court held that the wife had

established a fear of imminent physical injury that was not solely based upon a threat of suicide:

> In the present case, we cannot hold that the incident where Michael smacked the chip off of Ashley's arm constituted a physical injury within the definition of domestic violence or abuse. However, the definition also includes "the infliction of fear of imminent physical injury," which we hold Ashley established by a preponderance of the evidence. She testified under questioning by her attorney and the family court that she feared for her safety after Michael, who was intoxicated, smacked the chip off of her arm and that she did not know what would have happened if 911 had not called back at that moment. Michael admitted that he might have struck Ashley with more force because he had been drinking. But what pushed this into the realm of domestic violence was Michael's text message to Ashley threatening to commit suicide.

*Id*. at 405 (footnote omitted). In a footnote, the Court noted that the husband had a concealed carry license. *Id*. at n.1. In the present case, unlike in *Ashley*, there is no evidence of past violence, and Richmond did not have a concealed carry license. The only element that is similar is the threat to commit suicide.

In *Crabtree v. Crabtree*, 484 S.W.3d 316 (Ky. App. 2016), the husband repeatedly threatened to commit suicide in front of his wife and children by shooting himself with a shotgun unless she agreed to stay married. The husband admitted this at the DVO hearing and that he had told his work supervisor that he intended to harm himself. *Id*. at 317.

-10-

This Court relied on two unpublished opinions to support its conclusion that the wife in *Crabtree* had established that an act of domestic violence and abuse had occurred under these circumstances:

> In the unpublished decision in *J.D.Y. v. B.H.D.*, No. 2007-CA-001519-ME (2008 WL 4182050) (September 12, 2008), a panel of this Court was presented with a factual scenario similar to that herein, and concluded:
>
>> After reviewing the record, the family court's findings that the father committed domestic violence and abuse against the mother and their children were proper. The domestic violence statute cannot be interpreted as narrowly as the father suggests. The father informed the mother that he would commit suicide in the presence of their three children. While the father contends that this threat was not directed at hurting any family members, the inevitable consequence of such a statement is to terrorize the recipients of the information. Moreover, while the children did not hear their father's threat, they necessarily were ensnared in the threat as well. Accordingly, the family court's findings were not clearly erroneous, and the issuance of the domestic violence orders was proper.
>
> *Id*. at *4. *See also Dixon v. Dixon*, No. 2009-CA-000408-ME (2009 WL 2341048) (July 31, 2009) ("[W]e believe Kathey's testimony regarding the incidents when she contends O'Dell put a handgun to his head and threatened suicide was substantial evidence of a probative nature which would indicate that she felt threatened by O'Dell's actions.") *Id*. at *2.

-11-

*Crabtree*, 484 S.W.3d at 318-19. In addition, the wife testified that the husband had been violent in the past and that she feared for her and the children's physical safety. *Id.* at 319. In the present case, Richmond threatened to commit suicide away from Angela, and in fact attempted to do so many miles away from her, and he had not been violent in the past.

And in *Matehuala v. Torres*, 547 S.W.3d 142 (Ky. App. 2018), this Court reversed a DVO that was based upon the husband's throwing out the wife's personal property without first contacting her:

> [N]o evidence of violence or harm was presented, nor was any testimony elicited regarding infliction of fear of imminent injury, abuse or assault. The sole reason relied on by the trial court in entering the DVO was Omar's discarding of items personal property from a seemingly abandoned trailer home. We conclude this is insufficient under the law. The complete lack of evidence of past or present physical threats or abuse, contact between the parties, or fear of imminent harm, wholly undermines the trial court's conclusion. Omar's actions in disposing of Jeanetta's personal property without first contacting her may not have been reasonable or sensible, but those acts do not rise to the level of domestic violence as that term is statutorily defined.

*Id*. at 145. As in this case, Richmond contends that there was no evidence to support the infliction of fear of imminent injury.

Our review of Richmond's September 30, 2021, email containing his suicide note reflects that it contains the motivation behind his decision to end his life. Richmond certainly blamed Angela for this decision, but he in no way stated

-12-

or even alluded to the notion that he intended to physically hurt her or commit this act in her presence. His threat of violence was towards himself rather than any other person. Angela described the note as "insulting and derogatory" in her petition, which we cannot hold meets the definition of domestic violence and abuse. In her petition, Angela stated that because Richmond did not value his own life and named her as the cause of his planned suicide, he did not value her life, leading her to fear for her life. While receiving such a note would certainly be upsetting, we do not agree that this note could reasonably have caused Angela to be in imminent fear for her own safety. Based on the circumstances of this case, including a lack of history of domestic violence and a suicide note that did not indicate a plan to harm her or anyone other than himself, we cannot agree with the family court that Angela had a reasonable fear of imminent harm.

We also agree with Richmond that any fear Angela expressed was based upon the statements of third parties whose testimony or evidence was not presented at the hearing. Angela testified that Richmond's sister told her that he had a history of mental illness as well as a handgun and that his therapist told her that Richmond would not take the breakup well. The family court indicated that it would not be relying on statements of third parties, which was correct. In *Fraley*, *supra*, this Court addressed a similar situation where a third party instilled the fear in the wife, not the husband:

In the present case, Gail contradicted herself multiple times in the hearing, stating at times that she was not fearful of Dale and that she did not worry about her safety, and at other times stating that she would feel unsafe if the court did not enter a protection order. Nonetheless, she never alleged that Dale had acted violently toward her in the past, had injured her, or had threatened violence in any way. She based her alleged fear of Dale on her marriage counselor's uninformed opinion that Dale had sociopathic tendencies and on the fact that her counselor told her Dale had unplugged Gail's telephone to keep her from having outside contact. The family court properly stated that, under the circumstances of this case, it would not consider the opinions that the marriage counselor provided to Gail. However, the court stated that it would consider the "impact" of those opinions on Gail; the court erred in doing so.

It was the marriage counselor who instilled fear in Gail. There were no allegations or evidence that Dale had ever acted violently toward Gail or threatened violent actions toward her. Consequently, the family court erred in finding that the circumstances of this case met the definition of "domestic violence and abuse" because there was no evidence that Dale inflicted the fear of imminent physical injury on Gail. Thus, the family court abused its discretion in entering the DVO against Dale in this case.

*Fraley*, 313 S.W.3d at 640.

Turning to the present case, we agree with Richmond that the family court abused its discretion in finding that an act of domestic violence and abuse had occurred and may occur again. Angela's fear was not reasonable based upon

-14-

contents of the suicide note and the lack of violence in the past.  Her belief that the note was insulting and derogatory does not rise to the level of domestic violence.

For the foregoing reasons, the domestic violence order of the Shelby Family Court is reversed.

CETRULO, JUDGE, CONCURS.

DIXON, JUDGE, CONCURS IN RESULT ONLY.

BRIEF FOR APPELLANT:        NO BRIEF FOR APPELLEE.

Trevor M. Nichols
Lexington, Kentucky