Michael Shane **GIBSON**, Appellant

v.

Shelby Suzanne **CAMPBELL-MARLETTA**, Appellee

NO. 2016-CA-000038-ME

Court of Appeals of Kentucky.

NOVEMBER 4, 2016; 10:00 A.M.

---

2. $1256.67 (minimum wage job at 40 hours per week) + $1050.00 (maintenance) - $3040.23 (Amy's reasonable monthly expenses) = -$733.56.

BRIEF FOR APPELLANT: Theodore R. Martin, Lexington, Kentucky

BRIEF FOR APPELLEE: Martha A. Rosenberg, Lexington, Kentucky

BEFORE: COMBS, J. LAMBERT, AND VANMETER, JUDGES.

## OPINION

LAMBERT, J., JUDGE:

Michael Gibson appeals from the Fayette Circuit Court's entry of a Domestic Violence Order (DVO) and the court's order denying his motion to vacate or for further findings. Finding no error, we affirm both the trial court's entry of the DVO and the court's subsequent order.

The parties have a lengthy history before the Fayette Circuit Court. Michael and Shelby had one child during their marriage, a son named Roman, and divorced in 2007. The parties share custody of Roman and have equal timesharing. The parties have been before the court regarding numerous motions.

Regarding the current appeal, the parties had an encounter in May 2015 con-

cerning Roman's soccer shoes. Alleging that Michael threatened to kill her if she came onto his property to get Roman's shoes, Shelby filed for an Emergency Protective Order (EPO) on May 26, 2015. In support of this, Shelby alleged that Michael had previously stated that he could put a bomb under her car or place her body in acid. A domestic violence hearing was scheduled for June 25, 2015, but the parties agreed to extend the EPO until a hearing was held on September 17, 2015.

At the hearing, Shelby testified that on May 26, 2015, she and Michael texted back and forth regarding her picking up Roman's soccer shoes at Michael's house. She testified that it was her understanding based on correspondence on the previous evening, that Michael was going to leave the shoes on the porch that morning for her to pick up. When she texted Michael that she was at his house to pick the shoes up, Michael texted back and told her she did not have permission to be on his property. After several other exchanges, Michael texted that if Shelby came onto his property again, she would be treated as a hostile trespasser and that he would protect his property with all force allowed under the "Ky castle law." Shelby asked Michael if he knew what the Castle doctrine was, and Michael responded by asking her if she knew. Michael again warned Shelby to stay off his property and stated that if she thought calling the police was going to help, she was crazy. He then stated that she better have the police with her if she stepped back onto his property. Shelby's counsel introduced a print out of the text message exchange, which reflects Shelby's testimony regarding the events on May 26, 2015.

Shelby also testified that on the previous Sunday evening, May 24, 2015, she went to pick Roman up at Michael's house and found Roman and another of Michael's children home alone without Michael present. She testified that the other child's mother, Kimberly Gibson, called the police upon finding the children home alone.

On cross-examination, Shelby testified that she had contact with Michael since the issuance of the EPO. Shelby explained that she received a call from her son's school on August 13, 2015, stating that Roman had not been picked up. She went to pick him up around 3:15 p.m., and when she arrived, Roman seemed upset, so she asked him if he was okay. Shelby testified that Michael arrived and grabbed Roman by his backpack and stated, "It's not your day, you can't talk to your son." Michael's counsel introduced a video taken by a school camera of the encounter between Michael and Shelby.

After questioning Shelby about the video, Michael's counsel briefly questioned Michael about the events. Michael testified that Shelby began to yell that he had an EPO against him, and male teachers came out of the school to assist. One of those teachers told Michael he had called the police.

Shelby testified that she is afraid Michael might kill her. Upon questioning, Shelby explained that Kimberly Gibson, Michael's ex-wife, told her that Michael was going to put a bomb under her car. Ms. Gibson also told her that Michael had researched an acid he could put on her skin so that her body would not be recognized. She stated that she did not seek protection at this point because she was trying to work with Michael regarding their son. Shelby further testified that she was told by another of Michael's acquaintances that she was first on Michael's "hate list." With regard to physical violence, Shelby testified that there had not been any instances, but there was one time that she ran from Michael and had to shut and lock the door and call the police.

On re-direct, Shelby testified that with regard to Roman's forgotten belongings, Michael would not drop anything off at her house. She would ask if she could pick Roman's things up, and Michael would give her permission and then would withdraw that permission and ask her not to come onto his property. She stated that this instance was the first time she felt true fear, because Michael had given her permission to pick up Roman's soccer shoes, and when she did, he threatened her with the Castle doctrine. She testified that she had formed the habit of ringing the doorbell at Michael's house and then stepping back onto the sidewalk so that she would not bother him.

Michael called Carrie Black as his first witness. Ms. Black testified that she does cancer research. She testified that she and Michael are best friends and had discussed going into research and development together and did some business together. Ms. Black testified that she did not know Shelby, but that she had seen her and knew she was Michael's ex-wife. Ms. Black further testified that she had observed Shelby sitting in a car parked outside Michael's house watching Michael wash his car and that she was intimidated by this.

Michael testified that Shelby has harassed him and continually instigated trouble since the divorce in 2007. He explained that she would come to his door and cause scenes with Roman there, and that was why he had asked her not to stand on the porch when she picked Roman up at his house. With regard to this particular incident, Michael testified that he had mentioned that Roman left the shoes and to let him know if Roman needed them, because he could drop them off at Shelby's house and leave them on the porch on his way to the interstate. He denied that he ever gave Shelby permission to come to his house on Tuesday, May 26, 2015, to pick up the shoes. He stated that he assumed Roman did not need the shoes when he did not hear back from Shelby the previous day.

After hearing the testimony, the family court stated that it was familiar with the parties' history, particularly with regard to Roman. Further, the court stated that it was disappointed that the parties were still fighting about trivial matters such as clothes. The court found that based upon his mention of the Castle doctrine, it was clear to the family court that Michael intended to warn Shelby that he would shoot her if she came onto his property again and that no other meaning could be taken from his statements. Subsequently, the trial court entered a DVO for a period of two years for no contact, to expire on September 17, 2017. The trial court also indicated that the parties could not cooperate in any manner with regard to Roman, and that the issues of visitation and exchange would be addressed in the civil matter between the parties.

Michael filed a motion to vacate the DVO, or in the alternative for the court to issue specific findings of fact and conclusions of law based upon the evidence of record. The court held a hearing on this motion on November 20, 2015. Michael argued that there was not substantial evidence to support the entry of a DVO and that he did not intend to threaten violence when he mentioned the Castle doctrine in the text message exchange. The trial court stated that based upon the events leading up to the exchange on May 26, 2015, there was substantial evidence to support the entry of a DVO because Michael had made threats of violence. The trial court denied Michael's motion for more findings and entered a written order on December 14, 2015. This appeal now follows.

▬▬ Kentucky Revised Statutes (KRS) 403.720(1) defines domestic violence as "physical injury, serious physical injury,

sexual abuse, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, or assault between family members . . . ." When entering a DVO, the trial court determines that a petitioner has shown by a preponderance of the evidence that an act or acts of domestic violence has occurred and may again occur. *See* KRS 403.750(1). *See also Bissell v. Baumgardner*, 236 S.W.3d 24, 29 (Ky. App. 2007). In order to enter a DVO, the trial court must decide that a petitioner is more likely than not to have been a victim of domestic violence. *Baird v. Baird*, 234 S.W.3d 385, 387 (Ky. App. 2007) (quotations omitted). Our review in this Court is not whether we would have decided the case differently, but rather whether the trial court's findings were clearly erroneous or an abuse of discretion. *Cherry v. Cherry*, 634 S.W.2d 423, 425 (Ky. 1982); Kentucky Rules of Civil Procedure (CR) 52.01.

■ Michael's first argument on appeal is that the trial court's entry of a DVO was based upon his statement that he would exercise his statutory rights, which he argues he was entitled to make. Thus, he contends the trial court improperly relied on his statement regarding his statutory right to use the Castle doctrine. In support of this, Michael argues that he would be immune from prosecution under KRS 503.085 if he actually carried out the warning he gave to Shelby. Michael argues that Shelby did not prove that he stated he would shoot her or kill her, but that instead he referenced that he would exercise his rights under the Castle doctrine. Michael further argues that because he did not utilize any force and was out of town at the time he made the statements, Shelby could not reasonably have felt in fear of her life or in fear that domestic violence would occur.

In her brief, Shelby argues that the DVO was entered based upon the threats Michael made to shoot her if she came onto his property again and not based upon his exercise of statutory rights. The trial court agreed with Shelby that Michael's claim that he was simply exercising his statutory rights was disingenuous.

We find no error in the trial court's findings or its legal conclusion that Michael made serious threats of domestic violence against Shelby. The Castle doctrine is set forth in KRS 503.055, which states:

(1) A person is presumed to have held a reasonable fear of imminent peril of death or great bodily harm to himself or herself or another when using defensive force that is intended, or likely to cause death or great bodily harm to another if:

    a. The person against whom the defensive force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered a dwelling, residence, or occupied vehicle, or if that person had removed or was attempting to remove another against that person's will from the dwelling, residence, or occupied vehicle; and

    b. The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.

(2) The presumption set forth in subsection (1) of this section does not apply if:

    a. The person against whom the defensive force is used has the right to be in or is a lawful resident of the dwelling, residence, or vehicle, such as an owner, lessee, or titleholder, and there is not an injunction for protection from domestic

violence or a written pretrial supervision order of no contact against that person;

b. The person sought to be removed is a child or grandchild, or is otherwise in the lawful custody or under the lawful guardianship of the person against whom the defensive force is used;

c. The person who uses defensive force is engaged in an unlawful activity or is using the dwelling, residence, or occupied vehicle to further an unlawful activity; or

d. The person against whom the defensive force is used is a peace officer, as defined in KRS 446.010, who enters or attempts to enter a dwelling, residence, or vehicle in the performance of his or her official duties, and the officer identified himself or herself in accordance with any applicable law or the person using force knew or reasonably should have known that the person entering or attempting to enter was a peace officer.

(3) A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force.

(4) A person who unlawfully and by force enters or attempts to enter a person's dwelling, residence, or occupied vehicle is presumed to be doing so with the intent to commit an unlawful act involving force or violence.

A review of the above does not persuade us that Michael had the right to protect himself under the statute, or as he referred to it, under the Castle doctrine. The testimony reflects that Shelby went to Michael's house to pick up Roman's shoes and that Michael had granted her permission to do so within 48 hours of the incident. Thus, the trial court's finding that Shelby did not attempt to forcibly or unlawfully enter Michael's home is supported by the parties' testimony and the evidence of record. We too find Michael's arguments about the Castle doctrine to be disingenuous, because Michael was not present when Shelby stopped at his house to retrieve the shoes, and he was in no way threatened or intimidated by her to the point that he felt he needed to use deadly force to protect himself. Instead, the text messages reflect that when Shelby texted Michael that she was at his house to pick up the shoes, he stated that she had no right to be on his property and that he would shoot her if she ever came back. In the context of two parents co-parenting their son, this is an imminent threat of domestic violence.

Michael next argues that Shelby was required to prove by a preponderance of the evidence that an act or acts of domestic violence and abuse have occurred and may again occur under KRS 403.750. In support of this, Michael argues that he was in Louisville on the day of the incident and that Shelby could not reasonably have feared for her life.

Again, we disagree with Michael's arguments. Shelby testified that she became fearful of her life when Michael threatened her with the Castle doctrine. She further argues that it was her belief that Michael was setting up a justification for a future use of force by his statement that she had

192

no concept of reality and was therefore a dangerous person simply because she was picking up shoes that her son had forgotten.

While Michael and his friend, Ms. Black, testified that Shelby had harassed Michael in various ways over the years since the divorce, the trial court ultimately believed Shelby's testimony that she feared for her life. We find no error in this regard, as the record was replete with evidence supporting Shelby's testimony and evidencing irrational behavior and statements by Michael. The trial court's finding that serious threats of physical violence were made and may continue to be made is supported by the record, and we will not disturb that finding on appeal.

■ Next, Michael argues that the trial court erroneously allowed Shelby to testify about statements made by Michael to his ex-wife, Kimberly Gibson. Michael argues that statements made by Ms. Gibson to Shelby that he would put a bomb under Shelby's car or put her body in acid constituted inadmissible hearsay and were unduly prejudicial. He contends that absent an exception, hearsay is not admissible.

Shelby argues that the testimony about Ms. Gibson's statements was not elicited by her attorney, but was instead introduced when Michael's counsel questioned her about the conversation. Indeed, the record reflects that the discussion of Ms. Gibson's statements occurred during cross-examination and that Michael's counsel then objected, arguing the statements constituted hearsay. The record further reflects that Shelby's counsel argued that the statements could come in as an exception under Kentucky Rules of Evidence (KRE) 803(3) as a state of mind exception. The trial court stated that the hearsay rules are not strictly applied in the context of DVO proceedings and that Shelby's state of mind was relevant. Michael argues

that the testimony did not concern Ms. Gibson's state of mind, but instead went to Shelby's state of mind with regard to Ms. Gibson's statements and her fear of Michael.

■ We agree with Michael that the KRE 803(3) exception is not directly applicable here, because the statements were not being used to show the declarant's, Ms. Gibson's, state of mind. However, while the statements were prejudicial, the trial court had ample other evidence to determine whether or not there were grounds to issue a DVO. In fact, the trial court stated that it was basing its ruling on Michael's conduct on May 26, 2015, when he threatened to shoot Shelby if she came onto his property again, and not based upon other statements that escalated Shelby's fears. Again, we find the trial court's findings of fact and legal conclusions to be supported by the record, and any introduction of Ms. Gibson's testimony was harmless and was in fact raised by Michael's counsel.

■ Michael next argues that the trial court improperly excluded a report created by Dr. Hartley, who completed an evaluation of both Shelby and Michael under an agreement entered by the trial court on June 15, 2015. He argues that the report was relevant as to whether or not domestic violence had occurred and should have been considered.

We do not find any error with regard to the trial court's failure to consider Dr. Hartley's report. Dr. Hartley was never deposed and she was unavailable to testify at the DVO hearing to authenticate her report. We further agree with Shelby's argument that the purpose of the meetings with Dr. Hartley was to assist Shelby and Michael in communicating with each other to co-parent Roman and not to make a determination of whether domestic violence occurred. Thus, because the trial

court was vested with determining whether or not domestic violence had occurred and might again occur, it was not error for the trial court to exclude Dr. Hartley's report as evidence, as such report was not relevant to whether a DVO was warranted under the circumstances.

Finally, Michael argues that the trial court should have allowed him to make a closing argument and summarize the evidence and that he was not afforded a fair hearing to present evidence. He also contends that the trial court should have issued more specific findings.

We disagree. The trial court conducted a lengthy hearing, at which Michael was able to present evidence without interruption. At the end of the hearing, the trial court made the determination that domestic violence had occurred, based on the threats made in the text messages sent to Shelby by Michael. The trial court's decision was supported by a preponderance of the evidence, and the trial court emphasized that it was familiar with the parties' history since their separation in 2007 and their inability to get along to parent their son. The trial court was in the best position to judge the credibility of the testimony presented by the witnesses.

Finding no error, we affirm the Fayette Circuit Court's September 17, 2015, entry of a domestic violence order and the trial court's December 14, 2015, order denying Michael's motion to alter, amend, or vacate.

ALL CONCUR.