RENDERED:  JUNE 17, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1153-ME

JULINA M. WINLAND                                            APPELLANT


                        APPEAL FROM HARLAN CIRCUIT COURT
v.               HONORABLE KENT HENDRICKSON, JUDGE
                        ACTION NO. 21-D-00147-001


MYKAL L. RINGSTAFF                                            APPELLEE


AND


NO. 2021-CA-1154-ME

KEVIN LUCAS                                                   APPELLANT


                        APPEAL FROM HARLAN CIRCUIT COURT
v.               HONORABLE KENT HENDRICKSON, JUDGE
                        ACTION NO. 21-D-00148-001


MYKAL L. RINGSTAFF                                            APPELLEE

** ** ** ** **

BEFORE:  CETRULO, LAMBERT, AND McNEILL, JUDGES.

LAMBERT, JUDGE:  Julina M. Winland and Kevin Lucas have appealed from the September 2021 domestic violence orders (DVOs) of the Harlan Circuit Court sought by Mykal Ringstaff on behalf of himself, in Kevin's case, and on behalf of Julina's five minor children in both cases.  We affirm.

Mykal Ringstaff is a resident of Harlan, Kentucky, and is Julina Winland's father as well as the grandfather of her five children, two boys born in 2005 and 2013 and three girls born in 2007, 2009, and 2011.  The children's father is Edwin Alan Winland (Alan), who is not a party of these actions.  Kevin Lucas is Julina's friend/boyfriend.

On August 6, 2021, Mykal filed petitions with the Harlan District Court against Julina and Kevin seeking orders of protection.  In the petition against Julina, Mykal stated that between January 8, 2021, to the present day:

> Julina moved to Ooltewah TN [with] live in boyfriend[.]
> Apart[ment] covered [with] dog feces that grandchildren
> were forced to clean by Kevin Lucas (boyfriend)[.]
> Kevin is angry & violent towards grandchildren.  My
> failing to keep them safe from Kevin[.]  Most of [the]
> time they are living in vehicle homeless.  Kevin carries
> firearm on person and states he is not responsible for his
> actions if he gets angry.  My grandkids are unsafe in
> Julina's & Kevin's care.

> They are behind in school & in medical care. They need attention.
>
> I need protection for my grandchildren. They are unsafe in Kevin's & Julina's care. Please help me keep my grandchildren SAFE!

Mykal sought protection against Julina on behalf of her five children as well as temporary custody of the children. The district court entered a protective order summons and scheduled a hearing for August 19, 2021.

In the petition filed against Kevin, filed the same day, Mykal stated that during the same period of time:

> Kevin is an extreme danger to my grandkids. He is extremely short-tempered and states that he is not responsible for his actions if he gets upset. He carries a gun and does a count down when angry saying "I could just kill someone." He forced my grandkids to clean up his dogs' feces in apt and got upset at my oldest grandson [Child 1] and threatened him because he was guarding bathroom door to keep Kevin from going in on his sister [Child 2]. [Child 1] has recordings if needed of Kevin making threats to him. Children are afraid and do not want to be around Kevin. I need to protect my grandkids from further abuse from Kevin.

In this case, the court entered an emergency protective order (EPO) on August 6, 2021, that also awarded temporary custody of the children to Mykal, and a hearing was set for August 19, 2021.

At the August 19, 2021, hearing date, the court ordered the Cabinet for Health and Family Services (the Cabinet) to investigate the allegations and

continued the hearing to September 9, 2021. At that time, the matter was transferred to circuit court, and Kevin's hearing date was rescheduled to September 20, 2021. The hearing in Julina's case was continued to September 27, 2021.

The court held the DVO hearing regarding Kevin on September 20, 2021. Mykal testified first and stated that he was a pastor. His daughter, Julina, lived with Kevin in Tennessee. Kevin carried a firearm. As to why Mykal filed the petition, he stated that he was concerned with Kevin's temper and erratic behavior around the children, and he reported that Kevin had taken his 15-year-old grandson to a location where he served him alcohol while they shot firearms. He also reported that Kevin did a lot of cursing. Mykal explained that Kevin had tremendous anger management issues and would tell people they had two minutes to respond or he would "lose it" and not be responsible for his actions. He referred to his gun one time when he made such a statement.

Mykal testified that Kevin's home is poorly maintained and that he made the children clean up dog feces and urine. Mykal was concerned about the children's safety as they expressed that they were afraid of Kevin and did not want to be around him. The children were currently in Mykal's temporary custody and were attending school in Harlan County. He said that Kevin had threatened the children, but he was not aware that Kevin had inflicted any physical injury on them. Mykal related an incident where Kevin permitted the seven-year-old

-4-

grandson to climb on heavy equipment while it was running, without wearing any protective gear. Mykal thought this placed him in danger of imminent harm.

Mykal waited to file the petition until August because the location of the children had been changing. They left the state in January 2021 with Julina and Kevin and then moved in with their maternal grandmother who lived in Georgia. They stayed in Georgia until mid-May when they returned to Tennessee to live with Julina and Kevin. The children went to summer camp and returned to Mykal in July. Mykal described the situation as total chaos based upon his telephone conversations with the children. At that point he decided to intervene with a protective order to keep the children away from Kevin, not Julina. But he believed Julina was unstable and was not able to care for the children.

Mykal stated that Kevin showed up at the summer camp with a firearm, which was forbidden at the camp. He also stated that after the last court appearance, Kevin attempted to have Mykal investigated for "stealing" the children and called his place of employment to get him fired. What prompted him to file the petition in August was Kevin's attempt to retrieve the children and take them back to Tennessee. The children did not want to go back to Kevin's house.

Mykal went on to describe the sleeping arrangements at Kevin's house. Kevin and Julina slept in a trailer beside the house while the children had to sleep on air mattresses on the floor around the odor of urine and feces or sleep

outside in a car or another trailer. Mykal thought this was dangerous. He reported his concerns to social services in August but this was only investigated by Cabinet worker Tommy Key after the court ordered it as the children were out of state. He believed the children would be in imminent risk of harm if the DVO were not granted.

Tommy Key testified next. He is an investigator with the Cabinet and was asked by the district court to speak with the children. He spoke with the children, and that investigation was still ongoing. The children expressed environmental fear and reported that Kevin would lose his temper and had a firearm. They did not discuss any fear of Kevin but appeared to be apprehensive when talking about him and Julina. Kevin objected to any testimony as to the condition of the house, arguing that environmental conditions are not part of the definition of domestic violence. The court disagreed as a bad environment can affect someone's health. The children spoke with Mr. Key individually, and they each reported dog feces and trash being in every room. They would sometimes sleep in a tractor trailer on the property, and their mother would run an extension cord to the trailer. Julina and Kevin would sometimes lock the children outside of the home, and the children would sleep in the trailer. Mr. Key contacted Tennessee to request a courtesy visit to get photographs of the trailer, but no one answered the door on the three occasions they went to Kevin's residence. As he

had only been asked to talk with the children rather than substantiate or unsubstantiate the allegations, Mr. Key did not have an opinion about whether the DVO should be granted. He would be filing a written report.

On cross-examination, Mr. Key reported that the children told him the family had been constantly on the move for the last two years. They had lived in cars in a Walmart parking lot and at the baseball field, as well as in a badly damaged house. He did not find any evidence that the children had suffered any physical injury or any injury at all. The only evidence of a threat of physical injury was Child 1's report that he had verbally argued and fought with Kevin on three occasions, but no physical harm occurred. He also spoke with Julina and Kevin. He found no charges against Kevin that would prevent him from carrying a firearm. He was not aware of any previous complaints that had been made. Later in his testimony, Mr. Key noted the children's dental issues and that there were no records of vaccinations.

On redirect examination, Mr. Key stated that he could substantiate educational neglect and possible medical neglect over the last two years. The children were being tested to see how far behind they were. Mykal had put them into school. The children had not been seen medically for at least four years. Mykal started medical care for them. Mr. Key testified that harm could result from the children not having regular medical check-ups. He again stated the children

had lived in cars in multiple parking lots and slept in the dugouts when they lived at the baseball field. Mr. Key had photographs from Mykal of the residence on Little Shepherd's Trail in Kentucky, which were introduced. The children had shown him in the photographs where they slept among the debris.

Child 1 was questioned by the judge. He was 15 years old at that time. Alan Winland was his father. Kevin had come into his life 9 months previously. His parents were getting divorced, and Kevin was Julina's unofficial boyfriend. The court asked Child 1 about living in a tractor trailer in Tennessee. He described the trailer as being insulated. He had been living in the house on Little Shepherd Trail before going to Tennessee in late January 2021. He recognized the Kentucky residence in the photos. He said that they would stay there one night per week and stay in parking lots or parks the rest of the time. They would sleep in a car or at his grandfather's church. He described living with his grandfather as nice and said that it was clean. They all had their own bedrooms.

Child 1 stated that Julina and Kevin took the children to Tennessee, where they lived in filth, including dog feces. Kevin said he had not taken care of the house for a year; Kevin had been living outside of the residence in the trailer. Child 1 had slept in a car while he was there. He stated that Kevin had verbally abused him and made threats, which Child 1 stated were Kevin telling him he

would not be a success in life because he was just like his father. Kevin told him that if he did not straighten up, he would make his life miserable. His mother, Julina, agreed that Kevin was doing the best thing for him. He said Julina homeschooled them. The last formal education he remembered was in September 2017. Julina only taught them math and language. His last physical medical examination was in 2015 or 2016.

The judge questioned Child 3 next. She was eleven years old and in the fifth grade. She liked living with her grandfather. She said she had lived in the house that appeared in the photographs. She did not go to school when she was in Tennessee. The house in Tennessee was not clean, and she slept in a trailer.

Lastly, the judge questioned Child 2. She was 14 years old and in the seventh grade. She did not get along with Kevin. She also identified the house in the photographs as one she had lived in. She confirmed that before she moved to Tennessee, they would park in parking lots during the day.

The photographs of the residence on Little Shepherd Trail were introduced through Mykal, who had taken them in Harlan County in August. Kevin had never lived there, but Julina and the children had. The court noted the photographs would be relevant in Julina's case and noted that they had been living in filth in Tennessee.

Kevin testified next. He admitted that he carried a firearm pursuant to a permit issued by the state of Tennessee. He was not a convicted felon. He had known the children since January 2021 and denied that he had ever threatened them with physical harm. He said that the children had visited his residence in Tennessee, but they were not permanent residents there. He described it as a commercial building with a residential 1700-square-foot apartment inside. He owned two outside dogs. He denied that the apartment had dog feces in it. He admitted that there was mess from his inside dog from a year before that he had been unable to clean up due to his medical issue.

When the children came to Tennessee, Kevin began the process of cleaning the apartment. During that process, the children moved out to live with their maternal grandmother. They had lived at his residence for a week before moving in with the grandmother, where they stayed for about four months. After spending a week at Kevin's residence, the children went to Michigan for a wedding and then to camp. The four younger children then returned to his residence in late June/early July. They were still working on cleaning the residence at that time, but he denied that he made the children clean. Child 5 stayed with them while two of the girls went to summer camp. Child 1 went on the road with his father. Kevin said that the children's father began stalking and harassing him. He was not aware that Mykal had pursued any charges against him,

but Julina's husband had tried to.  Kevin claimed that Alan had filed false statements with the police.

On cross-examination, Kevin testified that he was 40 years old and had completed either the seventh or eighth grade in his education.  He was going through a divorce in Tennessee.  He had seven other children, two step- and five biological children, with the oldest one being 22.  He denied ever threatening anyone with a gun but said he had one to protect himself.  Julina had been living at his residence since June when her mother kicked them out.  He knew that Julina had homeschooled the children.  He admitted that he had taken his gun to the camp.  He researched whether he could take it with him and there was nothing that said he could not.  He was not seeking custody of the children.  He gave them a home because they did not have one.  He also said Child 1 had been harassing him, calling him names.  He was helping Julina as she had nowhere to go.

At the conclusion of the hearing, the circuit court entered a three-year DVO and ordered Kevin not to get near the children.  After noting the disturbing evidence that had been presented, the court stated that this case was more of a dependency, neglect, and abuse (DNA) case and that it had never seen a better case for emergency removal.  Mr. Key reported that there was no active investigation on custody.  The court directed Mr. Key to give Mykal the necessary information if he wanted to pursue one.  Counsel for Mykal stated that he wanted to do this.  A

written DVO was entered on September 22, 2021, and it was to be effective until September 21, 2024. The court found that domestic violence and abuse had occurred and may again occur, and the DVO provided protection for Mykal as well as the five children. Kevin appealed from the entry of the DVO (Appeal No. 2021-CA-1154-ME).

The hearing in Julina's case was continued to September 27, 2021, to see if the parties could reach an agreement, which did not happen. Mykal testified first. He sought a DVO against Julina because the children were not in a safe place. She continued to remain with Kevin, despite the DVO that had been entered against him. The children were still with Mykal. He had not known that Julina had been homeless for a few years as the children were not allowed to say anything. They had lived in a car or in the church basement for a while. They had also lived in a tractor trailer at Kevin's residence. Julina had been homeschooling the children, and they were all behind. Mykal had obtained the power of attorney from the children's father, Alan, for their educational and medical needs. Alan had already signed a document agreeing that Mykal should have custody of them.

Mykal identified the photographs he had taken of Julina's residence at Little Shepherd Trail, where she had lived with her husband and the children. The court permitted the photographs to be introduced over Kevin's objection. The photographs, the court ruled, established environmental harm that would amount to

domestic violence because it was unhealthy and could certainly harm the children physically, emotionally, and mentally.

Mykal stated that the children were not up-to-date on their vaccinations; he had caught them up one week ago. The visitation with Julina the prior week went well at first, until her husband, Alan, showed up and altercations ensued. The children were acting out and visibly upset, and Child 1 "lost it." Alan spent the night in jail, and Mykal almost took Child 1 to be committed for a 72-hour hold. He wanted Julina to get a stable home so that she could take care of her children, and he wanted to retain custody until she could do so. The children were terrified to go back to Julina's place, and they did not want to be around Kevin. Mykal discussed the issues with Kevin, including the anger management issue, his dirty home, and the presence of a firearm. Mykal feared for the safety of the children.

On cross-examination, Mykal testified that both Julina and Alan were responsible for the state of the house in Harlan County. He contacted child protective services at the end of July. But because the children were in Tennessee, Mykal was in Kentucky, and there was no physical violence, a case was not opened. He could not wait for the Cabinet to get back to him, so he went to the city attorney and filed an emergency petition. Mykal had tried to get Julina help and set up a place for her to live, but nothing worked.

Mr. Key testified next. He interviewed the children, who reported the home with Julina as being nasty, with dog feces and trash. The children were presently in a safe environment with Mykal. In the past, they had lived in parking lots and in the dugouts at Huff Park. The Cabinet did not have a recommendation as his only direction was to interview the children. The children expressed fear of Kevin due to anger issues and that he carried a gun. It would be up to Mykal to initiate a Cabinet investigation.

Child 1 testified under oath as a witness next. He and his siblings were living with Mykal and were in school. They had been homeschooled, not very well, by their mother prior to that. He had not been to school since 2017. They stayed in the church basement and spent time in a car in the Walmart parking lot or at Huff Park. They were homeless as they did not have a proper place to live. They never really went to the doctor after 2015/2016 as Julina believed in herbal healing. His grandfather made sure he got all of his shots. He had visited with his mother a week ago at Mykal's home. He wanted to stay with Mykal, where he had a regular schedule and was in school. He and his siblings were making friends at school.

At the conclusion of the hearing, the court stated it was entering a one-year DVO and awarded temporary custody of the children to Mykal. In making this ruling, the court stated that the children had been adrift for a long, long

time and were now in school and in a good home with Mykal. Julina needed to make adjustments. The result was mandated, it stated, to save the children.

On September 29, 2021, the court entered a written DVO against Julina that was to be effective for one year, until September 27, 2022. This order provided protection for the children. As with the DVO in Kevin's case, the circuit court found that domestic violence and abuse occurred and may again occur. The circuit court awarded Mykal temporary custody of the children, and it stated that Julina would only be permitted to have visitation with the children when supervised by Mykal, at Mykal's home, at his discretion, and as he permitted. Julina appealed from the entry of the DVO (Appeal No. 2021-CA-1153-ME).

On appeal, Julina and Kevin contend that the circuit court erroneously found that environmental neglect constituted domestic violence and abuse. And as to Kevin specifically, he argued that there was no factual basis to support that he had threatened the children.

"Domestic violence and abuse" is defined in Kentucky Revised Statutes (KRS) 403.720(1) as "physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple[.]" KRS 403.740(1), in turn, provides that "[f]ollowing a hearing ordered under KRS 403.730, if a court finds

-15-

by a preponderance of the evidence that domestic violence and abuse has occurred

and may again occur, the court may issue a domestic violence order[.]"

In *Williford v. Williford*, 583 S.W.3d 424, 427-28 (Ky. App. 2019)

(footnote omitted), this Court explained the standards of proof and review in

domestic violence cases:

> When we review a decision of the family court, "the test is not whether the appellate court would have decided it differently, but whether the findings of the family court are clearly erroneous, whether it applied the correct law, or whether it abused its discretion." *Coffman v. Rankin*, 260 S.W.3d 767, 770 (Ky. 2008) (quoting *B.C. v. B.T.*, 182 S.W.3d 213, 219-20 (Ky. App. 2005)).

> The preponderance of the evidence standard is met when sufficient evidence establishes that the petitioner is "more likely than not" to have been a victim of dating violence and abuse, sexual assault, or stalking. *See Baird v. Baird*, 234 S.W.3d 385, 387 (Ky. App. 2007) (applying the preponderance of the evidence standard in the context of the issuance of a domestic violence order).

> Additionally, [Kentucky Rules of Civil Procedure (CR)] 52.01 provides that a trial court's "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *See also Reichle v. Reichle*, 719 S.W.2d 442, 444 (Ky. 1986). Findings are not clearly erroneous if they are supported by substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). Substantial evidence is evidence of sufficient probative value that it permits a reasonable mind to accept as adequate the factual determinations of the trial court. *Id.* A reviewing court must give due regard to the trial court's judgment as to the credibility of the witnesses. *Id.*

As we explained in *Clark v. Parrett*, 559 S.W.3d 872, 875 (Ky. App. 2018) (quoting *Gibson v. Campbell-Marletta*, 503 S.W.3d 186, 190 (Ky. App. 2016)), "[o]ur review in this Court is not whether we would have decided the case differently, but rather whether the trial court's findings were clearly erroneous or an abuse of discretion."

We also recognize that "the family court is in the best position to judge the credibility of the witnesses and weigh the evidence presented." *Williford*, 583 S.W.3d at 429 (citing *Hohman v. Dery*, 371 S.W.3d 780, 783 (Ky. App. 2012)). And we are mindful that "[t]he domestic violence and abuse statutes are to be interpreted by the courts to allow victims to obtain protection against further violence and abuse." *Kingrey v. Whitlow*, 150 S.W.3d 67, 70 (Ky. App. 2004).

In the present case, the circuit court based the entry of the DVOs on the fear of imminent physical injury portion of the definition as there was no evidence presented that any of the children had been physically harmed. "For purposes of KRS 403.720, the term "'[i]mminent" means impending danger, and, in the context of domestic violence and abuse . . .[,] belief that danger is imminent can be inferred from a past pattern of repeated serious abuse.' KRS 503.010(3)." *Fraley v. Rice-Fraley*, 313 S.W.3d 635, 640 (Ky. App. 2010).

For their joint argument, Kevin and Julina assert that environmental neglect does not meet the statutory definition of domestic violence and abuse and that the circuit court abused its discretion in so holding. They argued that the statutory definition and associated case law does not allow for actions that may cause physical injury, but rather this requires actual physical injury or the infliction of fear of imminent physical injury. Here, they asserted that the circuit court stated that environmental neglect fit the definition of domestic violence because it could cause physical injury. But because there was no evidence that the children had been physically injured or that there was a fear of imminent physical injury due to environment neglect, it could not meet that definition. They point to Mykal's testimony that he had been aware of the unsanitary conditions at the Kentucky residence for years prior to seeking protection for the children, meaning that there was not a fear of imminent physical injury. In addition, Kevin and Julina argue that actions for environmental neglect may be brought by the Cabinet for Health and Family Services through a DNA petition.

In his brief, Mykal contends that environmental neglect can fall within the scope of KRS 403.720 and, if decided otherwise, would result in public policy implications that would prevent individuals from obtaining emergency relief. This would place the burden on the Cabinet to investigate and file a DNA petition at its

-18-

discretion.[1]  And a Cabinet petition would not provide any remedy to those not subject to the Cabinet's jurisdiction.

In *Collett v. Dailey*, 371 S.W.3d 777, 778-79 (Ky. App. 2011), this Court affirmed the entry of a DVO brought by a guardian on behalf of her elderly mother against her son (the guardian's brother) for his harassment, verbal abuse, and interference with the mother's caregivers, which we believe provides support for the DVOs entered in this case:

> Hazel, at the time of the petition, was an eighty-three-year-old woman who had recently broken her hip. She was in need of assisted care and at a high risk for falling.  James prevented caregivers from attending to his mother; from giving Hazel her medications and food; and, from providing physical support and assistance to her.  Although his mother used a walker, James removed the night lights and placed throw rugs in areas where Hazel would need to walk.  These actions impeded his mother's ability to walk safely in her home.  Because of Hazel's fragile condition, these actions by James meet the statutory definition of domestic violence. Consequently, James put her (or, in this case, her guardian) in fear of imminent physical injury and serious physical injury as contained in the definition of domestic violence found in KRS 403.720(1).  Therefore, in this case, with this petitioner, the evidence supports the issuance of a protective order.
>
> The domestic violence statutes are to be interpreted by the courts to effectuate certain express legislative purposes.  The first listed purpose of the domestic violence statutes is as follows:

---

[1] We recognize that KRS 620.070(1) permits "any interested person" to file a DNA petition in the juvenile session of the district court.

-19-

> To allow persons who are victims of domestic violence and abuse to obtain effective, short-term protection against further violence and abuse in order that their lives will be as secure and as uninterrupted as possible[.]

KRS 403.715(1). James's actions were contrary to allowing Hazel to have a secure and uninterrupted life. As such, in the instant case, Hazel is a victim of domestic violence. . . .

Here, the trial court was in the best position to weigh the credibility of the witnesses who testified that James created conditions at the home of his mother that could have resulted in physical injury to her. The trial court could certainly find that James's actions were not mere interference or harassment but were actions that could have left his mother without medically required care and that created dangerous conditions within the home. Oneeta and the representative of Adult Protective Services testified that they were afraid that James's actions would result in physical injury to Hazel since James engaged in a pattern of conduct that continuously placed his mother at risk.

The definition of "imminent" is found in KRS 503.010(3) as follows: "impending danger, and, in the context of domestic violence and abuse as defined by KRS 403.[720], belief that danger is imminent can be inferred from a past pattern of repeated serious abuse." Under the facts of this case, with an elderly and infirm petitioner, James exhibited a past pattern of repeated serious abuse that put his mother at risk for the behavior from which the domestic violence statutes were designed to protect.

While she had not suffered any injury from her son's actions, his pattern of past conduct placed the elderly mother at an imminent risk of impending danger due to her fragile state. Here, while the children had not yet been injured by the state of Kevin's residence, the risk certainly existed.

And Mykal has cited to our unreported decision in *Martin v. Hanaki*, No. 2016-CA-000202-ME, 2017 WL 2392514, at *3 (Ky. App. Jun. 2, 2017), to support his argument:[2]

> Paul argues that insufficient evidence existence in the record to support a finding that domestic violence occurred, or may occur again, or that Saori was in fear of imminent domestic violence. In support of this argument, Paul largely relies on his own testimony, where he denied and minimized the allegations against him. Paul points to the fact that, despite his concerning behavior, he never physically harmed Saori. Conversely, Saori specifically testified that she felt threatened and feared imminent physical injury. Saori explained that she felt Paul was unable to control his emotions. Further, Saori expressed her deep concern and alarm as a result of Paul's behaviors, which caused her to be in fear of imminent physical injury. She also testified to the physical act of Paul pulling her hair and holding her down during sexual intercourse, which she described as intentional and fear inducing.
>
> We find this case to be analogous to *Hohman v. Dery*, 371 S.W.3d 780 (Ky. App. 2012), where, despite there being "no evidence [the victim] suffered physical

---

[2] *See* CR 76.28(4)(c) ("Opinions that are not to be published shall not be cited or used as binding precedent in any other case in any court of this state; however, unpublished Kentucky appellate decisions, rendered after January 1, 2003, may be cited for consideration by the court if there is no published opinion that would adequately address the issue before the court.").

injury or assault[,]" this Court held that the victim's belief that the perpetrator's "aggressive confrontations would escalate 'to the next level'" was sufficient to uphold the trial court's finding of domestic violence. *Id.* at 782-83. Here, despite there being little evidence Saori suffered physical injury or assault perpetrated by Paul, we find that substantial evidence supports a finding that Paul inflicted upon Saori fear of imminent physical injury or assault.

Based upon the specific circumstances of this case, we hold that substantial evidence supports the circuit court's finding that the children were at risk of imminent danger from Kevin and Julina. There is ample and credible testimony concerning the filthy and unsafe state of Julina's prior home with her husband and children in Harlan County, as shown in the photographs, as well as about the state of Kevin's residence in Tennessee and how the children were forced to live in that unsafe environment. While the children, for the most part, had been away from Kevin and Julina for several months, the risk of harm escalated when it was time for them to return to Kevin's residence in Tennessee at the end of the summer. At that point, Mykal filed the petitions to protect the children from the risk of harm they would encounter if they were to return to Kevin's residence. We also note Julina's nomadic existence with the children for the two years before she moved to Tennessee with Kevin, where they spent much of their days in parking lots or at the ballpark. In addition, the children had expressed their fear of Kevin to Mykal and of their fear of living in such an environment to Mr. Key and in the

-22-

court proceedings. Finally, Julina continued to live with Kevin even after the DVO against Kevin had been entered.

The evidence presented at the hearings establishes that the children were victims of domestic violence as Julina and Kevin had inflicted the fear of imminent physical injury upon them and as the threat of imminent physical injury may occur again. This threat would arise if the children were to return to Kevin's residence in Tennessee due to the environmental conditions they were forced to endure, Kevin's anger management issues, and the past history of environmental neglect and the nomadic existence they had with Julina. While we certainly agree that this action would more appropriately have been brought under a DNA petition, that was not possible in this case because Kevin and Julina lived out of state and, thus, were unfortunately not subject to the Cabinet's jurisdiction. The circuit court did not abuse its discretion in issuing the DVOs against Kevin and Julina in these cases in order to protect the children from continuing to be exposed to the risk of harm they experienced with Kevin and Julina.

For the foregoing reasons, the domestic violence orders entered by the Harlan Circuit Court against Julina and Kevin are affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANTS:          BRIEF FOR APPELLEE:

Danny Lee Lunsford, Jr.          Otis Doan, Jr.
Harlan, Kentucky                 Harlan, Kentucky