RENDERED:  APRIL 3, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-1159-ME

JENNA OAKLEY                                                         APPELLANT


APPEAL FROM BOYLE CIRCUIT COURT
v.        HONORABLE DOUGLES BRUCE PETRIE, JUDGE
CASE NO. 25-D-00123-001


PHILIP WAYNE OAKLEY                                              APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; CETRULO AND KAREM, JUDGES.

KAREM, JUDGE:  Jenna Oakley appeals from a domestic violence order

("DVO") entered by the Boyle Family Court, barring contact with her father,

Phillip Oakley.[1]  Jenna argues that the trial court abused its discretion in relying on

testimony about threats she made against Phillip in her diary in 2016.  She also

---

[1] The appellee is designated as Philip Wayne Oakley in the notice of appeal.  In the body of the
Opinion, we have used the spelling of his name, Phillip, as it appears in the circuit court record.

argues that the admission of other evidence and the manner in which the trial court conducted the hearing rise to the level of palpable error. Upon careful review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Phillip has not filed a brief in this appeal. Under these circumstances, this Court may:

> (a) accept the appellant's statement of the facts and issues as correct; (b) reverse the judgment if appellant's brief reasonably appears to sustain such action; or (c) regard the appellee's failure as a confession of error and reverse the judgment without considering the merits of the case.

Kentucky Rule of Appellate Procedure (RAP) 31(H)(3).

Because of the gravity of the case, we will accept Jenna's statement of the facts, supplemented by our own review of the record, and we will consider the merits of the appeal.

In 2016, when she was fifteen years of age, Jenna was living with her father and her stepmother, Rhonda. She resided in the basement of their home. According to Jenna, her living conditions would have warranted a dependency, neglect, and abuse action.

Jenna had an adult boyfriend, Kenneth Nigh, who was enlisted in the military. He left his base in Colorado and, unbeknownst to Phillip and Rhonda, lived in the basement with Jenna for several days. He and Jenna planned to run

away together.  On September 16, 2016, as they were packing up and preparing to leave, Rhonda unexpectedly came home.  Kenneth killed her, and he and Jenna fled in Rhonda's car.  The police apprehended the couple in New Mexico.  Jenna was taken to a juvenile detention facility and Kenneth was taken to an adult facility, where he hanged himself.  He later died in the hospital.

The case was the subject of extensive media coverage, including an episode of a national true-crime TV program entitled "Snapped: Killer Couples."

On January 14, 2019, Jenna pled guilty to manslaughter in the first degree and theft by unlawful taking over $10,000 (automobile).  She was sentenced as a youthful offender to ten years on the manslaughter charge and five years on the theft charge, to be served consecutively.  In March 2019, when she reached eighteen years of age, she was resentenced as an adult to the same sentence.

On August 6, 2025, Jenna was released from prison to begin mandatory re-entry supervision at a halfway house in Jefferson County.  On the next day, Phillip filed a petition for an emergency protective order ("EPO"), alleging as follows:

> ON . . . [SEPTEMBER 16, 2016] JENNA WAS
> INVOLVED WITH KILLING MY WIFE SHE WAS
> FOUND GUILTY AND PUT IN PRISON.  AT THE
> TIME OF THE INVESTIGATION HE[R] JOURNAL
> WAS FOUND IT STATED THAT THE PLAN WAS
> TO KILL MYSELF MY WIFE AND MY SON.  JENNA

ALSO STATED DURING HER PAROLE HEARING THAT HER INTENTION W[AS] TO KILL ALL 3 OF US.  SHE WAS RELEASED ON MANDATORY REENTRY SUPERVISION ON 08/06/25.  JENNA HAS ALSO STATED TO ME THAT WHEN SHE GOT OUT OF PRISON SHE MAY DO SOMETHING TO GET PUT BACK IN PRISON BECAUSE IT WASN'T THAT BAD.

The trial court granted the EPO and conducted a hearing on the petition on August 14, 2025.  Phillip testified that in 2016, prior to Rhonda's death, Jenna wrote in her journal that she planned to kill her father and brother.  He testified that, at her parole hearing, Jenna stated that if her father and brother had been present on the day Rhonda was killed, she would have killed them as well.  Phillip testified that no one at the parole hearing asked Jenna whether she had a present intention to kill anyone.  He also testified that he had spoken to her "a few times" on the phone, the last time being several years ago, and she had never told him she "didn't mean it," in reference to the diary entry.

On cross-examination, he acknowledged that Kenneth Nigh, not Jenna, killed Rhonda.  He reiterated that Jenna had never apologized or been remorseful about anything.  He testified that he personally saw her diary, which was also featured prominently on "Snapped," and that the diary entry stated that she was going to kill him first, call him downstairs and cut his throat; then she was going to kill her brother, then Rhonda.

-4-

The record from Jenna's criminal case was produced for the hearing, but the diary was not included as part of it. The trial court observed that because Jenna entered a guilty plea, the diary would not have been entered into evidence.

Jenna was represented by counsel at the hearing. She initially invoked her Fifth Amendment right not to testify, but upon hearing Phillip's testimony she waived the privilege. She testified that she had no intentions of harming anyone and had no intention of returning to Danville, where the crime took place. She testified that she spoke with her father on the phone in 2021 to apologize for her part in the case and that she made no threats. She testified that she was no longer the fifteen-year-old girl she was at the time of the crime, that she had a lot of remorse and guilt, and reiterated she had no intention of hurting anybody.

When the trial court asked Jenna whether she had kept a journal which contained threats, she replied yes. Upon further questioning by the trial court, she admitted that she had never sent anything to her father to indicate that she no longer had those threats in mind. Jenna also acknowledged that she had said something to her father about doing something to get herself put back in prison, but explained she was being sarcastic. She testified that she made the statement in 2020, when she was nineteen years of age. The trial court asked whether in 2020 she was still potentially a danger to her father. She said that she was not, but she had not really taken accountability for her actions at that time. The trial court

-5-

asked her how long she had been incarcerated at that point. She replied, "Four years." The trial court then asked, "After four years in talking to your dad, you had not yet taken accountability for your actions, correct?" She replied, "Yes sir." Upon further questioning, she testified she began taking accountability for what she had done at the end of 2022, but she had not had a conversation with her father since that time.

At the conclusion of the hearing, the trial court stated that the statutory findings to support the issuance of a DVO could be based on a threat that was nine years old, based on the nature of the threat. It noted that Jenna had been held criminally accountable for what she did when she was fifteen years of age and had been treated as an adult. The trial court further noted that Jenna had never expressed any remorse to her father. The court concluded:

> What we do know is . . . that he's still in fear of imminent physical injury and his point is well taken. He didn't have any expectation that she might engage in the activity which led to the death of his wife that she did back when she was fifteen, sixteen years old. And yet, that indeed occurred and the only reason that extrinsically when one looks at it . . . it [further violence] couldn't have occurred up until now is because she's been in custody and there wouldn't have been any reason for him to have filed the domestic violence petition during those years because she would have been in jail. But now she's out and he says, I still have this fear of imminent physical injury and it's based upon what took place then. And the fact that I don't have any real confidence that she's changed. And I think that's

-6-

sufficient for the court to enter this order in light of the
fact that we know that she did make those threats.

The trial court's written order granting the DVO stated in pertinent
part as follows:

Proof established that when the Respondent was 15 years
of age she was convicted of manslaughter 1st when she
caused, at least in part, the death of the Petitioner's wife,
her stepmother. At the time of her conviction, it was
discovered that she kept a journal where she voiced
homicidal ideation regarding the Petitioner. She has been
in custody until only recently, when she was released by
the Department of Corrections for Mandatory Reentry
Supervision (MRS). As a result of her release, the
Petitioner testified that given her previous actions and
threats towards himself, he is in fear of imminent
physical injury.

Given the gravamen of the offense the Respondent
committed, as well as the threat to the Petitioner, the
Court finds that the findings can be made that the
Respondent has placed the Petitioner in fear of imminent
physical injury and that the requested order is supported
by the evidence regarding the possibility of future
conduct.

This appeal by Jenna followed.

**STANDARD OF REVIEW**

When we review the grant of a DVO, the question "is not whether we
would have decided the case differently, but rather whether the trial court's
findings were clearly erroneous or an abuse of discretion." *Gibson v. Campbell-
Marletta*, 503 S.W.3d 186, 190 (Ky. App. 2016). An abuse of discretion occurs if

the trial court's ruling is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

## ANALYSIS

"Any family member or any member of an unmarried couple may file for and receive protection . . . from domestic violence and abuse[.]" Kentucky Revised Statute (KRS) 403.750(1). "Following a hearing . . . if a court finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur, the court may issue a domestic violence order[.]" KRS 403.740(1). "Domestic violence and abuse" is defined as "physical injury, serious physical injury, stalking, sexual abuse, . . . assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, . . . or assault between family members or members of an unmarried couple[.]" KRS 403.720(1).

Jenna contends the court abused its discretion in relying on testimony about the alleged contents of her 2016 journal to find there was a threat of further violence in 2025. She argues that because the diary was never introduced into evidence, she was unable to place the comments in context or even prove what she had actually written when she was fifteen years of age and living, largely ignored, in her father's basement. She argues that Phillip has never been a victim of domestic violence at her hands, that she has never made direct threats against him, and the threats in her diary date from nine years before the filing of the petition.

Although Phillip has never been the victim of any direct violence at Jenna's hands, Jenna pleaded guilty to first-degree manslaughter in the death of his wife, Rhonda, and her contemporaneous diary entries contained violent threats against Phillip as well. In her testimony, Jenna admitted making the threats. Although nine years have passed since she made the threats, she was unable to act on them because she was incarcerated.

Our case law is clear that the passage of time does not necessarily diminish the seriousness of a threat for purposes of issuing a DVO. In *Walker v. Walker*, 520 S.W.3d 390 (Ky. App. 2017), the Court held that the proof sufficient for the issuance of one DVO can be considered as sufficient proof to support the issuance of a subsequent DVO. The plain language of "KRS 403.740 only requires a court determine whether domestic violence has occurred at some point in the past." *Id.* at 392 (citing KRS 403.740(1)). *Walker* also cites two other opinions: *Kessler v. Switzer*, 289 S.W.3d 228 (Ky. App. 2009), and *Kingrey v. Whitlow*, 150 S.W.3d 67 (Ky. App. 2004), both of which hold that additional evidence of new domestic violence incidents is not required to re-issue a DVO. In *Kessler*, the Court held that nothing in KRS 403.740(1) requires a petitioner seeking to renew a DVO to present proof of continuing violence or violations of the initial DVO. *Walker*, 520 S.W.3d at 392 (citing *Kessler*, 289 S.W.3d at 231). In *Kingrey*, the Court approved the renewal of a DVO, despite the respondent's testimony that he

"had not contacted the petitioner or made any threats against her because the petitioner testified that she continued to be afraid of him." *Walker*, 520 S.W.3d at 392–93 (quoting *Kingrey*, 150 S.W.3d at 69). Although these three opinions all involved the renewal of a DVO, the underlying reasoning about an ongoing threat and continuing fear applies to the facts of the case sub judice.

Although Jenna did not commit any direct acts of domestic violence against Phillip in 2016, she did make serious threats of violence in her diary against him, Rhonda, and her brother. She was closely involved in the actual death of his wife, Rhonda, and ultimately pleaded guilty to first-degree manslaughter. A DVO was not entered against Jenna at that time, but she was incarcerated and therefore presented no threat to Phillip. In the years that followed, she communicated with Phillip but did not express any remorse. Under these circumstances, the trial court did not abuse its discretion in finding that her release from prison placed Phillip in fear of imminent physical injury.

Next, Jenna argues that the trial court relied on irrelevant, non-probative, and prejudicial evidence to support its entry of the DVO. She concedes that her arguments in this regard were not preserved, and seeks palpable error review pursuant to Kentucky Rule of Civil Procedure (CR) 61.02, which states in part:

> A palpable error which affects the substantial rights of a
> party may be considered by . . . an appellate court on

appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

"A palpable error must be so serious that it would seriously affect the fairness to a party if left uncorrected." *Hibdon v. Hibdon*, 247 S.W.3d 915, 918 (Ky. App. 2007) (citation omitted). "Fundamentally, a palpable error determination turns on whether the court believes there is a 'substantial possibility' that the result would have been different without the error." *Id.* (citation omitted),

Jenna contends that the trial court was "irrevocably determined" not to believe that she does not want to hurt Phillip, and that it cross-examined her as an advocate for Phillip rather than as a disinterested tribunal. Kentucky Rule of Evidence (KRE) 614(b) provides that "[t]he court may interrogate witnesses, whether called by itself or by a party." The trial court is directed to use this power sparingly because of its potential to sway the opinion of the jury. *Sigrist v. Commonwealth*, 660 S.W.3d 636, 642 (Ky. App. 2022) (citations omitted). This danger does not, however, exist at a bench trial. When the trial court is acting as the finder of fact, "judicial questioning of witnesses is subject to the court's discretion." *Couch v. Commonwealth*, 256 S.W.3d 7, 12 (Ky. 2008) (citation omitted). The trial court's interrogation of Jenna sought to establish whether she had made the threats in the diary and to clarify what her mental state had been since she was incarcerated. The trial court was not acting as an advocate for

Phillip in seeking to determine whether Jenna represents a threat to Phillip; it was seeking to determine the crucial question of whether the standard for issuing a DVO had been met. There was no manifest injustice resulting from the trial court's questioning of Jenna.

To illustrate the trial judge's alleged bias, Jenna cites to his comment at the beginning of the hearing that, like every other resident of Boyle County, he had read about the case when it occurred in 2016. She also claims the trial court improperly relied on Phillip's emotional testimony, on hearsay allegations about the contents of her journal, and on her statements at the parole hearing that she would have killed her father and brother if they had been present that day.

In its oral findings at the hearing and in its written order, the trial court clearly set forth the evidence it relied on in granting the DVO: the magnitude of the underlying crime against Rhonda, as evidenced by Jenna's prosecution as an adult for manslaughter in the first degree; the threats Jenna admitted she made against Phillip in her journal; the fact that her incarceration meant she could not act on those threats for nine years; and finally, her failure during that lengthy period to apologize or express any remorse to her father. The trial court's findings and written order simply do not reference or rely on the evidence to which Jenna now objects. Consequently, there is no indication the admission of that evidence affected the result, as is required to demonstrate manifest injustice.

Furthermore, the trial judge's straightforward statement that he was familiar with the underlying facts of the case from 2016 did not indicate any impermissible bias on the judge's part. He did question Jenna very thoroughly about the allegations in Phillip's petition, but she was represented by counsel throughout the proceedings and was provided with ample opportunity to challenge the allegations and to explain her point of view. The trial court's conduct of the hearing did not result in manifest injustice.

## **CONCLUSION**

For the foregoing reasons, the DVO issued by the Boyle Circuit Court is affirmed.

ALL CONCUR.

BRIEF FOR APPELLANT:                    NO BRIEF FILED FOR APPELLEE.

Maureen Sullivan
Louisville, Kentucky